Counsel, you may proceed. Good morning. I would like to save some time for rebuttal. You may do so. Actually, five minutes. Well, just watch the clock. Thank you. This is the first time I'm appearing before this court. I'd like to express my appreciation for this opportunity and remind the court that in this case, Mr. Tamaz David-Jonjolia, who appears right here before you, was found credible by immigration judge Mimi Yam. The BIA issued a streamlined decision. They did not dispute the credibility. In fact, Mr. Jonjolia showed during his testimony and in a six-page detailed asylum application how the fact that he's Jewish had affected his entire life in the Republic of Georgia in terms of housing, employment, education, his personal safety, his interaction with government authorities who were in a position to provide protection but chose not to protect Jews.  And he was told that if he was Jewish, he has to pay extra taxes, and they started to extort money from him. Mr. Jonjolia sought protection from the appropriate authorities. He was told initially, you're Jewish, get out of my office, you dirty kike, which is not a nice word. Then, so there was a nexus with the protected grounds of his nationality. Now, he went on to have a sting operation set up with the assistance of the tax authorities at a higher level. They did set up the sting operation. The person who came for the money was caught with the money in their hands, the marked notes. And then the case was never prosecuted due to lack of evidence, essentially. So there was no protection. Instead, what happened was he was hit over, clubbed over the head by some people on motorcycles. He went to the hospital. There was abundant hemorrhaging found by the doctor. And then he started to receive a series of threatening phone calls saying, get out of Georgia. And similar to experiences in his whole life in Georgia, they said, Georgia is for Georgians. You Jews get out, go to Israel, wherever you go. Or, as in the case of the tax authorities, you have to pay more taxes. Well, this is a little bit like the situation we see in Fiji with the Indo-Fijians and the cultural discrimination, which goes on rampantly. And some of that goes on in some of the former Soviet states. What is the evidence that connects his discrimination? He was victimized by various individuals who didn't like Jews. What is the connection that ties that in with a governmental policy or a refusal of the government to buy the government to protect its citizens from the more egregious forms of anti-Semitism and so forth? Well, Your Honor, the first parties he went to in the government threw the documents back at him and said, you dirty tyke, I'm not going to help you. He went to the higher authorities, who found through the sting operations that there was this extortion taking place, but they offered no protection. They dropped the case, saying there's no evidence, even though the handing over the marked bills happened right in front of them. Later he went to the police about this injury to his head. No one ever was found. He continued to call the police about the threats, and there was no protection for him, as there hadn't been any protection for his parents before him in terms of their housing, employment. And the government would like to think that's a personal problem. How is it when the tax authorities are charging you with more money because you're a Jew, how is it that the tax authorities won't prosecute anybody that's coming after you and then physically abusing you because you don't pay more money and you try to exercise your rights of protection for being extorted? How does that become a personal problem? A sting operation work out. The person who was handed the money, it happened right in front, either in front of the officers or the marked notes were indeed found on his person when they arrested him. But he was let go. He said, look, I didn't know what was in the envelope. So they said they didn't have any evidence. However, those were marked notes that were talked about with the tax authorities, which the person who was caught also represented. I mean, if he goes back to the Republic of Georgia, I don't know how he's supposed to avoid paying taxes or dealing with the tax authorities. The government would like us to believe that there's no pattern or practice of discrimination or abuse of people from Jewish nationality in the Republic of Georgia. And I submitted voluminous information to the contrary. The government had years. This case was continued and continued by the immigration judge, a master calendar hearing to master calendar hearing for a year and a half, two years. The government had plenty of opportunity to show other documents. And, in fact, the only thing they came up with was a report that itself indicated that there's a rising tide of anti-Semitism going on in the Republic of Georgia. So I'd like to also ask the government why when they talk about this not being a personal problem or no nexus, they keep referring to the Third Circuit, the Seventh Circuit, the Tenth Circuit, the Eleventh Circuit, anywhere but the Ninth Circuit. And in the Ninth Circuit, we have cases that are – that go right to the heart of this claim, Chan v. INS, which I took pains in my brief to show case by – point by point how the Fijian, who was also abused physically, how his case of asylum was granted and how it's similar to Mr. Janjulian's. In fact, that case, Chan v. INS, refers to another case of Jews from the Ukraine, another former Soviet Union region, that Koblenin is a Jewish family that was also abused over many years. So I think in the Ninth Circuit, we recognize any instance of physical abuse becomes persecution. Kelsie, you indicated you wanted to reserve some time. You're down to four minutes. Thank you very much. Good morning again, Your Honors. Shihira Tadros for the United States. Your Honors, in this case, first, the government would like to address the issue of exhaustion with regard to withholding and convention claims. Those issues are not before the Court because Petitioner failed to exhaust both of those issues. With regard to his – Petitioner's eligibility for asylum, Petitioner has failed to demonstrate compelling record evidence of past persecution or a well-founded fear of future persecution. Counsel, what is your evidence on the absence of persecution? You've heard counsel indicate quite a number of instances in which these remarks were made and this individual was discriminated against. Help me figure out whether that is sufficient to meet the persecution definition or not. And what's the government's position? Petitioner has to show three things in order to show past persecution, Your Honor. He has to show harm rising to the level of persecution under the Act. He has to show that he – that the government was unwilling and unable to protect him. And here, he – the harm that he claims he suffered, the immigration judge found that it didn't rise to the level of persecution. He – you know, persecution, as you all well – as Your Honors know, is a very extreme concept. And here, Petitioner – Petitioner's case rests on these events that occurred with the tax collectors. And even though Petitioner claims that nothing happened to these tax collectors, that's not exactly true. Petitioner did go first to the chief of the tax inspectors. And that person – Petitioner's veracity is not at issue. That person told him to get out, called him a bad name. But very quickly thereafter, Petitioner went to the chief of all police, of Interior Affairs, I believe it was. They helped him set up a sting operation. They did catch the person. But in the end, they found that they couldn't prosecute because there wasn't enough evidence. That puzzles me as to why, after the sting operation, they couldn't prosecute. The person denied knowing what was in the envelope, denied just that he was the middleman. But it doesn't just stop there. The record evidences that – Well, the opposing counsel says yes, but inside the envelope were the marked bills. He – the person carrying the envelope claimed he didn't know what he was passing on. Even if they were wrong, even if they were incorrect, it doesn't stand to reason that they would go to the trouble of setting up a sting operation, catch the person just to let them go. They have no – there's no – there's no evidence in the record of what motive they would have to do that when they were willing to assist Mr. Gingolia in the first place. But, Your Honors, the thing that hasn't been presented to you here this morning is that both that initial chief inspector for the taxes and the person that extorted money from him were later fired. And so there is evidence that the government at least took a step to get rid of these people. There's no evidence here of complicity or condoning what these people did. There's no evidence in the record, let alone compelling evidence. What does the country report on Georgia show about anti-Semitism? About anti-Semitism? I believe anti-Semitism is present, Your Honor, but I also believe that the record states that there's no pattern or practice of persecution. And, in fact, Petitioner in her brief, as well as before the Board, says that they didn't need to show a pattern or practice because – and so they don't show a pattern or practice. It is not – Are you referring to the country report when you say no showing of pattern? Yes. The country report specifically says – I'm sorry, I don't have the page number – but it specifically says that there's no pattern and practice, although there is anti-Semitism and discrimination against Jews. But, Your Honors, what – in the end, what Petitioner is asking you to do is to ignore his situation completely, ignore what happened to him. The fact that the government did come to his aid did help him. When did the government come to his aid? When he went to the chief of all of police to request his assistance. And they had the same operation? Yes. And when they – when these two people were fired, the chief of the tax inspectors was fired and the person that was extorting money from him was fired. And so, with regard to – Were they fired as a result of this problem? That's the implication in the record, Your Honor. We don't know, Your Honor. It is heavily implied in the record. Was it – timing-wise, was it real close? Yes. It was very close. One of them, I believe, was after Petitioner came to the United States, but it was close in time. It was within a year's time. If the IJ found him credible and he tells about an unpunished extortion that was religion-related, if not religion-motivated, Yes. why isn't that a past persecution? Because, Your Honor, even though Petitioner may believe that what happened to him happened for certain reasons, it doesn't necessarily mean that that is really what happened to him. I believe it's the case of Ochave, where the person can truly, honestly believe. He is not lying. He believes that what happened to him happened for the reasons that it happened. But when you look at the objective evidence in the record, it does not support that claim. Credibility goes to whether someone is fabricating their claim. And here, the immigration judge believed Petitioner. But believing someone doesn't necessarily mean they have a compelling case with regard to asylum under the laws of the United States. Do I have any further questions, Your Honor? Thank you. The only question I still have in my mind is whether the government was willing to protect by prosecuting. I have trouble with that sting operation. We don't know. When somebody hands somebody an envelope to bribe them, the fact that somebody doesn't know exactly what's in the envelope, that seems an awfully strange sort of approach for lack of prosecution. I don't know if that was the only reason, Your Honor. That was the evidence in the record. But, you know, even in the United States, it happens all the time, where crimes have been committed and people don't ever pay the price because there isn't enough evidence to convict them. So I believe that that's what happened in this case. But, again, these people weren't fired by, you know, citizens. They were fired by the government. And as I said, the record establishes that they were fired due to these practices of extortion. Thank you, Your Honor. Thank you, Counsel. Ms. Leidecker, you have some reserve time. First of all, we can't pull facts from the air. Even Mr. Gingelli himself and people who he's talked to back in the Republic of Georgia weren't sure. This was a rumor that one of the gentlemen, one of the men involved from the tax department was fired. This was a rumor which was never confirmed. So the government can't confirm that the person was fired. Mr. Gingelli can't even confirm that. And he repeatedly told the immigration judge it was a rumor. He wasn't sure. The fact is the person who was in the sting operation, who was caught with the marked bills in the envelope, claimed that he didn't know what was in the envelope. But like you were suggesting, Your Honor, that's kind of strange because the gentleman himself was sent by the tax authorities. He was part of that same department, and he was part of that overall group of persons who were trying to extort money because, on the basis of a protected ground, that he was Jewish, and he had to pay more as a result. So why isn't the past persecution and the government, their only response is, look at the case of Ochave? Well, that's a case in the Ninth Circuit, thank you very much, for a relevant case. But it's not relevant in the sense that it's a Filipino mother and daughter who were raped, a horrible situation. However, they were raped not because of a protected ground. Anyone at the time who came down from the mountains, it was a common occurrence that females were raped, and as soon as she and her family moved to Manila for a year, they were safe. Nothing else happened. There was no motivation for the rapes that was a protected ground of asylum, and that's why in Ochave she and her family were not granted asylum. So it wasn't past persecution because there was no nexus. In this case, every single incident documented and believed by the judge and by the Board of Immigration Appeals had to do with the fact that Mr. Gingoli and his family are Jewish. And even the government concedes that there's discrimination and anti-Semitism in the Republic of Georgia. They say there's no pattern or practice. In the Ninth Circuit, we don't have to show that. If there's a specific singling out of a person, which we've shown in this instance, and then beyond that the pattern or practice, the government only comes up with one document, which is a U.S. State Department report, and also a second document, which itself, it's on page 32 of Mr. Gingoli's brief, another document which shows that the U.S. State Department year 2000 annual report on international religious freedom. Georgia adequately described religious violence, but glossed over the atmosphere of impunity created by the Georgian government's failure to act. That's exactly what happened here. And the other document that they submitted shows that there's a rising, that on page 33 of the brief, in the same submission from the service, is a document entitled Prayer Profile, the Georgian Jew of Georgia. That document, in response to the question at the bottom, what are their needs, indicates that today the Georgian Jew is facing a rising tide of anti-Semitism. Thus, the two documents submitted by the government show, help to corroborate that anti-Semitism is a problem in Georgia and that people are not prosecuted, even when they're caught. For example, Mr. Gingoli's case. In the act, nothing is done. And there's been nothing submitted by the government to counter the prospect of. He has a degree in mechanical engineering. Didn't he get a degree in Moscow? Yes, he had to leave the Republic of Georgia in order to get an advanced education. Has he pursued that at all? He did, and he was never able to find a job in his field. And he documents all the discrimination about employment, so ultimately he had to find his own job and create a partnership. But his Georgian partner, no one ever extorted money from his Georgian partner in the business, only him. He was the only one who had to pay extra taxes because he was Jewish. The Georgian partner had no problem. But when Mr. Gingoli left the country, his business was burned down. He submitted a police report. It was arson. Thank you, counsel. Your time has expired. The case just argued will be submitted for decision.
judges: Goodwin, Hug, O'Scannlain